Filed 3/4/15  P.B. v. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| P.B.,<br><br>     Petitioner,<br><br>          v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>     Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>     Real Parties in Interest. | G051060<br><br>(Super. Ct. No. DP014288-002)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Petition denied.

Susanna Warner for Petitioner.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel for Real Party in Interest.

Law Office of Harold LaFlamme and Jess Ann Hite for Minor.

The court terminated P.B.'s (father) reunification services with respect to his daughter, now nine years old, (minor) and set a Welfare and Institutions Code section 366.26 hearing.[1] Father seeks a writ of mandate directing the court to order that he be given physical custody of minor, as well as a family maintenance plan. He contends no substantial evidence supports the court's finding that returning minor to his care would have created a substantial risk of detriment to her. We disagree and deny father's petition.

FACTS[2]

On March 10, 2013, seven-year-old minor was detained. The amended section 300 petition filed by Social Services Agency (SSA) alleged father failed to protect minor (§ 300, subd. (b)) and abused a sibling (§ 300, subd. (j)). The allegations included the following. Mother applied for and was granted temporary restraining orders against father protecting both mother and minor. On March 10, 2013, mother told police that father took minor in violation of the restraining order (although father claimed mother left minor in his care). On that same day, mother was found to be heavily sedated by prescription medicine and unable to care for minor. The parents repeatedly violated the restraining order. The parents have a history of domestic violence, both physical and verbal. Each parent has a criminal history. Father's criminal history included arrests and/or convictions for driving with a suspended license and under the influence of alcohol or drugs, causing bodily injury; child cruelty with possible injury; spousal battery; and possession of a controlled substance. Minor was a previous dependent of the juvenile court pursuant to a sustained petition which had alleged, inter alia, that father has

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] We recite facts relevant to father, since mother did not seek writ relief.

2

a history of abusing controlled substances and alcohol, and minor's paternal half-sibling was declared a dependent in 1996, after she sustained a fractured left arm.

SSA's jurisdiction/disposition report included the following . The social worker believed "mother has an unresolved mental health history based on her frequent emotional outbursts, erratic behavior, emotional instability, and poor judgment." Father "has a lengthy criminal history," including his pleading guilty in 2005 to child abuse and endangerment, driving under the influence of alcohol and causing injury, and driving on a revoked license. In March 2013, he pleaded guilty to driving on a suspended or revoked license. The social worker believed "the parents put the child at risk of abuse and neglect through their dysfunctional relationship" and by their violating the restraining order. The social worker had concerns about minor's education as she had "missed a great deal of schooling" and had frequently changed schools.

SSA's service objectives for father required him to express anger appropriately; stay sober and free from alcohol and drug dependence; meet minor's physical, emotional, medical, and educational needs; protect minor from emotional harm; and not behave in an abusive or threatening manner. Father was to complete a domestic violence program, general counseling, and parenting education, to submit to substance abuse testing, and to participate in a 12-step program.

On April 30, 2013, minor was placed with foster parents.

On July 30, 2013, father pleaded no contest to the amended petition's allegations. The court found them to be true and declared minor a dependent of the court. The court adopted the recommended case plans for the parents, and approved visitation of three times a week.

For the six-month review hearing, SSA reported that father had completed parenting and anger management classes and individual counseling. He was currently taking batterer's treatment classes. But he had not implemented the skills he had learned into his daily behavior. He still displayed behaviors of power and control, especially

3

toward minor, making visitation demands on her, showing little concern for her feelings, becoming angry and agitated if minor expressed disagreement, and talking to her negatively about mother. He drug tested, but consistently tested positive for oxycodone; he submitted no proof he had a prescription for the medicine. He drank alcohol, possibly while driving. Father denied any consensual contact with mother, but mother claimed otherwise. Father visited minor consistently, but the social worker believed he did not understand or pay attention to how his behavior or statements impacted minor. Minor adamantly expressed she did not want "off grounds visits" with father; in other words, she wanted the visits to be supervised. Minor told the social worker, her therapist, and the foster parents that the frequency and duration of parental visits were too much for her, and impeded her participation in extracurricular activities or playing with peers.

Father's case plan remained the same, except he was no longer required to attend parenting classes. The court set a 12-month review hearing, adopted the parents' recommended case plans, and reduced visitation to twice weekly.

*12-Month Review*

In its 12-month review report, SSA recommended, in minor's best interest, that the parents' reunification services be terminated and a section 366.26 hearing be set. Father maintained stable housing and reported he continued to work full-time. He participated in individual counseling and batterer's treatment.

Father had missed over a month and a half of drug testing, and had tested positive for marijuana and oxycodone. He had a medical marijuana card, but no current court approval allowing him to smoke marijuana. Father was attending 12-step meetings. His pain management doctor's office reported father was being treated for elbow and leg pain and edema, with prescriptions for oxycodone, Dilaudid, and Restoril, which would cause him to test positive for benzodiazepines, opiates and oxycodone. Father continued to drive without a license, even though SSA had given him a monthly bus pass. At a

4

September 23, 2014 meeting, the social worker and the foster parents noticed father smelled like alcohol; he had driven there on the freeway.

Father consistently visited minor, but had trouble managing and redirecting her negative behaviors. He "continued to make inappropriate comments to the child." Minor preferred that her visits with father be monitored.

At an event at minor's school on the evening of June 13, 2014, father was scheduled to visit minor. But mother learned about the event from the school's Web site. Two hours after father arrived at the school event, mother arrived and was angry. Father left. Mother stayed and followed minor around. When people gathered in a semi-circle around the school principal for the announcement of raffle prize winners, mother stood right behind minor, touched her, leaned close, and whispered in her ear, even though minor shrugged her off. Mother argued with the foster parents, and grabbed minor's arm twice. Mother left when the foster mother decided to look for the campus police officer. Minor was crying, shaking, and upset. She told the foster parents she thought mother was going to take her. She said that every time she has been in foster care, mother has tried to take her.

Thereafter, minor refused to visit with mother, saying she was afraid mother would take her or would try to whisper in her ear.[3]

Father continued to have unauthorized contact with mother, in violation of the criminal restraining order. At a court hearing in March 2014, mother told the social worker "all about a conversation that the [social worker] had with [father] the previous night." In July 2014, mother told SSA she had contact with father in person and by telephone during the last few months. In August 2014, mother told the social worker she had a birthday present for minor from mother and minor's siblings. The next day, father

---

[3]     On October 1, 2014, the social worker persuaded minor to have a "good bye visit" with mother. Minor insisted that two social workers and the foster parents be present. At the end of the visit, minor said she was unwilling to visit with mother again.

5

gave minor a birthday present that appeared to be from mother; the gift tag bore mother's writing and was from mother's other children.

In August 2014, mother showed up at the mall, where father had a scheduled visit with minor immediately after a court hearing. While father was in the Dave & Busters' bathroom changing his clothes, minor told the visitation monitor that she saw mother. Minor ducked under a table and starting crying. When father returned to the table, minor acted as though nothing had happened, although she had tears in her eyes. Father, minor and the monitor then went to Guitar Center for minor's drum lesson. Guitar Center employees blocked mother from entering the area where minor was, because mother had been acting "sketchy." The employees stated they recognized mother because she had come in with father a week or two earlier to schedule the drum lessons. Father denied telling mother he was going to visit minor after the court hearing, and believed mother had followed him to the mall when he walked there from the courthouse. Mother stated she was already at the mall eating when she noticed minor.

In September 2014, father told the social worker that mother was in his home when he returned home from a meeting with the social worker and the foster parents. When the social worker asked whether father had phoned the police, father replied, "'No, I didn't, what I wanted to do is beat the shit out of her.'" He also said, "'Somebody needs to do something about this, I'm either going to call the cops or shoot her.'"

Father had recently had an intimate relationship with another woman, who was under court supervision, had severe unresolved mental health issues, and did not have custody of her children. Father complained that this woman was harassing him after his visits with minor. Father said, "'I'm so close to getting up and punching [this woman] in her face and knocking her teeth out.'"

Meanwhile, minor was thriving in the foster parents' home. She continued to struggle academically, but with the support of the foster parents and the additional

6

services she received at school, was making some improvements. She participated in weekly individual therapy, had decreased her statements about death, and was now talking more about adoption. She stated she would like to be adopted by the foster parents and felt it was a safer environment for her. She showed little concern about the possibility of not seeing her parents anymore.

The 12-month review hearing commenced on August 26, 2014.[4]

1. *Mother's initial testimony*

Mother testified she was not in a relationship with father and had no contact with him. She testified that her report to the social worker that she had contact with him was false.

2. *Minor's therapist's testimony*

Minor's therapist testified minor's visitation with mother was detrimental and should cease for the foreseeable future. Minor's therapist believed it would be detrimental to minor not to have visits with father, but the visits should be monitored. Minor had told her therapist the parents' relationship scared her sometimes. For example, when mother had unexpectedly arrived at minor's drum lesson, minor had been scared and wondered how mother had known she would be there.

3. *Father's initial testimony*

Father testified he had learned in his classes how to deal with anger and break the cycle of domestic violence. For example, during the incident at minor's school,

---

[4] At the original 12-month review hearing on June 9, 2014, the court set a section 366.26 hearing, but it subsequently granted father's section 388 petition to recalendar a 12-month review hearing.

when father saw mother, he "took off running," instead of insisting that it was his turn to see minor.

Father testified his support system consisted of his parents, brother, friends, and neighbors. Conversely, he testified he did not have a 12-step sponsor, because he was advised "not to make any more friends anywhere or have any kind of relationship with anybody, so I just shut everybody off." The people at the 12-step meetings were like a family; he has friends who come home from the group to his house. He no longer had an alcohol problem; his last relapse had been about eight months before. At the meeting with the social worker and the foster parents, he had not been drinking and in fact had tested negative for alcohol that day.

Father testified he was not in a relationship with mother. When mother has shown up at father's visits with minor, it was not because father ever told mother where they would be. During the drum lesson incident, father had gone into the dressing room to change out of his suit and when he came out, minor was under the table and had tears in her eyes. He found out later that minor thought she had seen mother. Father had not told mother they would be there and he had not invited her to come.

The last time father had seen mother outside of court was about three months earlier, when mother came to father's home looking for food. Father asked mother how she got in and told her to leave. Father had the door locks changed after that episode.

4.       *Father's therapist's testimony*

Father's therapist testified she believed mother "was inserting herself into [father's] life without invitation." The therapist believed father was not a risk to minor at this time because he knew how to control his anger.

8

5.          *Mother's subsequent testimony*

On November 21, 2014, almost three months after she first testified, mother took the stand again and changed her testimony. She apologized "to everybody in the courtroom," saying: "I will be telling the truth about everything that I say right now. Yes, I have had contact with [father]." Mother had contact with him "on a daily basis." She stayed in his home every night; he let her stay there because she had no other place to live.

Father had physically abused her. He would get angry at night unless she went "to bed right away towards the wall" — so angry that he would grab a metal baseball bat from under his bed and raise it. Once, he hit her on the leg with the bat. Mother screamed, and father said, "If you woke my mom up you're dead." A week before, he had become angry and threw a hard piece of fruit (like a mango or a pomegranate) at the back of her arm, causing a bruise.

Father also abused her verbally, which hurt her more than the physical abuse: "[T]he verbal and mental abuse . . . is far worse than . . . almost any physical injury you can have because the bruises go away but the words do not . . . ." Last night he had said to mother in front of his friend: "'You are nothing but a piece of shit. . . . Everybody wishes you would die. Look at you. Look at you. You're skin and bones and nobody wants you around. Here eat, eat. You want something. You don't? Then starve.'" He would shout words at her "repeatedly like retard, retard, retard for . . . ten minutes straight."

She did not have a key to his home. On September 23, she was in his garage and had taken barbecue chicken and a cold baked potato from the garage refrigerator. They always ate together, "mostly whatever his mom makes. Like last night [they] had Mexican soup."

When mother's attorney asked mother if she realized her testimony would hurt both parents' chances of reunifying with minor, mother said, "I understand that, but I

9

can't do what I've done in the past with my ex-husband. I can't keep my mouth shut or the lies."

Father had implored mother, "Let the lime light shine on me because I was in jail, during the last case. 'Please . . . , just so they give her to one of us, please.'" Mother had replied, "'What's wrong with her going to me because you have domestic violence? . . . I don't have nothing.'" He said, "'No, you will take off to Wisconsin with her again. I know you will.' And then [mother] agreed."

Father had told mother she did not need to read SSA's reports.

The court noted mother had been emotional and crying throughout her testimony.

As to the drum lesson incident, father had texted mother they were at Dave & Busters, and to come to Guitar Center later. Mother sat at "the opposite side of the bar [at Dave & Busters] to have an angled vision of [minor]" because it had been so long since [she had] seen her." Mother did not want minor to see her because she did not want to get anyone in trouble. But minor saw mother. Minor's reaction was "devastating," forcing mother to draw her own conclusions about "why she did that."

Mother did not believe father would harm minor. He had never harmed mother in front of minor. Father had changed "a lot" due to his classes and now "checks himself before going towards me and doing anything," although he still scared mother "with his verbal ways and the look on his face."

6.        *Father's subsequent testimony*

Father took the stand again. He testified mother's recent testimony was not true. The only time he had seen her sleep at his home in the last six months was when he saw her laying on some towels in his backyard at around 2:00 a.m. In the last six months, he had texted her around five times because she said she needed food. Father did not have a bat under his bed, had not hit her, and had not thrown a piece of fruit at her. He

10

had noticed minor was upset at Dave & Busters, so he believed minor probably did see mother there. Father was with the visitation monitor when they first signed minor up for drum lessons. Father and mother had not been in an intimate relationship for over a year.

*The Court's Ruling*

The court found mother's November 21, 2014 testimony was credible. It found father and his therapist were not credible witnesses. The court found returning minor to parents would create a substantial risk of detriment to her safety, protection, or physical or emotional well-being. The court terminated the parents' reunification services and set a section 366.26 hearing for March 24, 2015.

DISCUSSION

*Substantial Evidence Supports the Court's Finding That Returning Minor to Father's Custody Would Create a Substantial Risk of Detriment to Her Safety, Protection, and Well-being*

Father contends the court erred by finding that returning minor to his care would create a substantial risk of detriment to her. He points out he completed parenting and anger management classes and individual counseling, and currently participates in a batterer's intervention program, drug testing, and 12-step meetings (although he states he has not shown the social worker evidence of his attendance at 12-step meetings). He contends there is no substantial evidence he is currently in a domestic violence relationship, and asserts mother's testimony was not credible.

Because the court's ruling at the 12-month review hearing took place over 18 months after minor was detained, both parties argued this case in their appellate briefs as though the court's order took place at a contested 18-month review hearing.[5] We

---

[5] "In some cases continuances and delays will cause the 12-month permanency hearing under [section] 366.21[, subdivision] (f) to be completed 18 months

11

summarize the law governing a court's finding of detriment at the 18-month review hearing. Under section 366.22, at the 18-month hearing a court must return a child to a parent's care unless the social worker proves, by a preponderance of the evidence, that the return "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).) The statute provides guidelines for a court to follow in assessing detriment. A parent's failure "to participate regularly and make substantive progress in court-ordered treatment programs" is prima facie evidence of detriment. (*Ibid*.) In assessing the risk of detriment, the court must consider "the extent to which [the parent] availed himself or herself of services provided." (*Ibid*.) The court shall also consider the "extent of progress that has been made toward alleviating or mitigating the causes necessitating placement in foster care." (*Ibid*., *id*., subd. (a)(1)(E).) Ultimately, the court must assess the effect that returning the child to parental custody would have on the child's safety, protection, or physical or emotional well-being. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.)

The substantial evidence standard of review applies to a court's finding that returning a child to the parent's custody would be detrimental. (*Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 625.) A reviewing court does "not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 947.) It draws all reasonable inferences and considers the record in favor of the juvenile court's finding. (*Ibid.*) The appellant bears the burden of showing the court's detriment finding is not supported by substantial evidence. (*Ibid.*)

or more from the date the child was physically removed from the custody of the parent. When that happens, there is a difference of opinion whether the hearing should be considered a 12-month permanency hearing under [section] 366.21[, subdivision] (f) or an 18-month permanency review hearing under [section] 366.22." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2014) § 2.153[1], p. 2-509.) Under the "better and more widely followed view," the 12-month permanency hearing merges into and becomes "the 18-month permanency review hearing without the necessity for a second or separate hearing." (*Ibid.*)

Father has failed to carry his burden. Substantial evidence shows he failed to achieve his case plan's objectives of protecting minor from emotional harm and stopping his abusive and threatening behavior. Mother's testimony showed father continued to (both physically and verbally) abuse and threaten mother, and that he told mother about his planned visit with minor at a mall (thereby causing minor emotional harm). Although father asserts mother's November 21, 2014 testimony was not credible, the trial court found otherwise. The court observed mother's disclosures were adverse to her own interests and had "a ring of truth." The court further found mother was not motivated by malevolence toward father, but instead had offered her testimony "out of a concern for her past experiences and the potential impact that it would have . . . on her daughter."

Substantial evidence also shows father failed to achieve his case plan's objectives of living free from drug or alcohol dependency, and progressing in a 12-step program. The social worker and the foster parents observed that father continued to abuse alcohol and even drove without a license while under the influence of alcohol. Father had failed to obtain a sponsor in his 12-step program. The court noted father's use of alcohol along with his prescription medicines raised "significant concerns."

The court found father's testimony was not credible. It noted the disconnect between father's testimony he did not obtain a 12-step sponsor because his therapist had advised him to cut off contact with everyone, versus his testimony he had a support system comprised of his family and neighbors. The court noted father testified he saw mother sleeping in the backyard only after mother testified on November 21, 2014, that she slept at his house. As to father's testimony he did not phone the police when mother showed up at his house because she needs help (rather than incarceration), the court noted these "magnanimous" comments conflicted with father's angry statements that he felt like beating or shooting her. These incongruous statements suggested father was gaming the process. The court further found father had been hostile, agitated, or displeased when asked certain questions on the stand.

The court found father's progress in therapy was minimal. Father had a propensity to manipulate and was not candid with his therapist. The court found father's therapist had been "captured to an extent where she lost the ability to . . . opine in a professional detached fashion."[6]

The court made thorough findings of credibility and fact. Substantial evidence supports its finding that returning minor to father's custody would have created a risk of detriment to her safety, protection, and well-being.

---

[6] Father argues the court was "not qualified to determine" if his therapist's professional opinion was accurate, since there was allegedly no "conflicting professional testimony or evidence to discredit" his therapist. Father provides no reasoned analysis or legal authority to support his assertion, and it is therefore forfeited. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

DISPOSITION

Father's petition for a writ of mandate is denied.


                                        IKOLA, J.

WE CONCUR:


ARONSON, ACTING P. J.


FYBEL, J.

15